**Opinion issued November 26, 2019.**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-19-00434-CV**

———————————

**IN THE INTEREST OF J.J.D.W., J.D.W., J.J.F.W., J.L.W., AND J.L.J.W. AKA J.L.J.W., Children**

---

**On Appeal from the 308th District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-44860**

---

## MEMORANDUM OPINION

J.C. ("Mother") and J.W. ("Father") are appealing a final order terminating their parental rights to their daughter, J.D.W. ("Julie"), and their sons, J.J.F.W. ("Jack") and J.L.J.W. ("Jeremy"), and establishing conservatorship with respect to their sons, J.J.D.W. ("John") and J.L.W. ("Jesse"). In two issues, Mother argues on

appeal that the trial court erred by: (1) failing to appoint her as John's and Jesse's possessory conservator, and (2) admitting the affidavit of voluntary relinquishment of parental rights that she executed with respect to Julie, Jack, and Jeremy because the affidavit had not been authenticated. In three issues, Father argues that there is legally and factually insufficient evidence supporting the trial court's findings that: (1) he committed the predicate acts under sections 161.001(b)(1)(D) and (E), and (3) termination of his parental rights is in Julie's, Jack's, and Jeremy's best interests. *See* TEX. FAM. CODE §§ 161.001(b)(1)(D), (E), & 161.001(b)(2). Finding no reversible error, we affirm the trial court's decree.

**Background**

On May 9, 2016, the Department of Family and Protective Services received a referral alleging that Mother had neglectfully supervised her five children, John (five years old), Julie (four years old), Jack (three years old), Jesse (two years old), and Jeremy (one month old).[1] The report stated that Mother's drug use affected her ability to provide adequate care and supervision for the children, and that when the paternal grandmother, A.W., picked up four of the children, she could smell marijuana smoke as soon as the door was opened. The report further stated that the children are "usually dirty and their noses are snotty," there was no food in the home,

---

[1] The record reflects that John was born in September 2010, Julie was born in September 2011, Jack was born in September 2012, Jesse was born in May 2014, and Jeremy was born in April 2015.

2

and that Mother had been giving her food stamps to the homeowner. Additionally, the report stated that Mother and her children were being "kicked out of the home where they were living rent free because the mother had people coming and going from the living quarters." The Department was concerned for the children's well-being because of "mother's untreated mental health, lack of parenting skills, not having a stable home for her and the children and substance abuse." The record reflects that Mother has been diagnosed with, among other things, multiple personality disorder, and had not received treatment in several years.[2]

The children, who were initially left in Mother's care, were placed with a relative on July 4, 2016. Two days later, the Department filed an Original Petition for Protection of a Child for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship, wherein it requested, inter alia, to be named the sole managing conservator of John, Julie, Jack, Jesse, and Jeremy.

---

[2] The Department's records also indicate that Children's Protective Services had at least two previous interactions with the family. On September 5, 2011, the Department received a report of neglectful supervision after Mother tested positive for illegal drugs while pregnant with Julie. Later that month the Department received a report that 11-month-old John had been physically abused by Mother and Father. The agency determined that there was "a substantial risk of harm [to John] due to mother and father's violent behaviors and inappropriate discipline. The family has extensive CPS history." The children were living with Mother, her boyfriend, and their maternal grandmother at the beginning of September, but Mother and the children moved in with Father and his mother mid-month after Mother had a falling out with the maternal grandmother.

The trial court placed the children with their paternal grandmother, A.W., the next month even though she had a history with the Department and a criminal history. The Department later determined that the placement was "inappropriate and unsafe for all of the children" and removed them from A.W.'s care in November 2016 because she tested positive for amphetamines and methamphetamines. The four oldest children were placed with their maternal uncle, T.P., and his wife, A.C., and the youngest child, Jeremy, was placed with another maternal relative. Jeremy was subsequently removed from that relative's care and placed with T.P. and A.C. in February 2017.

On March 21, 2017, the Department received another referral of neglectful supervision of four-year-old Jack by Mother and A.C. after Jack was found wandering around the courtyard of an apartment complex, crying and unattended. The other children were walking around the complex looking for Jack when law enforcement arrived. The children were living with T.P. and A.C. at the time.

On May 16, 2017, the Department received another report of neglectful supervision alleging that Mother and the children were living together and that Mother was moving from house to house and leaving the children with random people. The report further alleged that the children were not getting enough to eat and were asking neighbors for food. Mother, who was pregnant at the time, was using methamphetamines and selling her food stamps for money. After a hearing

later that month, the trial court ordered that Mother was to have no unsupervised contact with the children or overnight visits and ordered the children to remain in T.P.'s care.

On July 20, 2017, the trial court named the Department as the children's temporary managing conservator, and ordered the children to remain with T.P.

In January 2019, Julie, Jack, and Jeremy were removed from T.P.'s care at his request and placed with other relatives. Julie was placed with Mother's aunt, P.P., and Jack and Jeremy were placed with a close family friend, G.C. Jesse and John stayed with T.P.

On February 6, 2019, Mother and the Department entered into a mediated settlement agreement ("MSA"). The MSA states that the Department will be named as John's and Jesse's permanent managing conservator and that "visitation between mother and [John and Jesse will] be set at times and places mutually agreed upon. Absent an agreement, visitation will occur every other Saturday from 2 pm to 6 pm" and will be "supervised by [T.P.] or [A.C.]." Mother also executed an affidavit relinquishing her parental rights to Julie, Jack, and Jeremy the same day.

A bench trial was held in March 2019. Father, who was twenty-six years old and serving a ten-year sentence for aggravated assault and aggravated robbery, was the first witness to testify. Father's criminal records, which were admitted into evidence, reflect that he pleaded guilty to the state jail felony offense of possession

of a controlled substance in October 2010 and was sentenced to six months in jail. His oldest child, John, was one month old when Father was sentenced. In March 2013, Father pleaded guilty to the state jail felony offense of possession of a controlled substance, cocaine, and was sentenced to seven months in jail. In July 2015, Father pleaded guilty to committing the first-degree felony offense of aggravated robbery with a deadly weapon (a firearm) in October 2014 and the second-degree felony offense of aggravated assault with the deadly weapon (a firearm) in December 2014. He was sentenced to ten years' incarceration for each offense, with the sentences to run concurrently. His projected release date is February 2, 2025. At the time Father committed this offense, John was four years old, Julie was three years old, Jack was two years old, Jesse was one year old, and Mother was pregnant with Jeremy. In addition to these offenses, Father also testified that he had been convicted of possession of marijuana in 2011 and 2012 and sentenced to thirty days in jail each time. He also testified that he had been incarcerated in either the Harris County Jail or TDCJ for most of his young children's lives and he acknowledged that his physical absence from their lives had been a hardship to them.

Father initially testified that he had spoken to his children several times, and that the children were living in three different homes where they were doing well and were "in the best of health." He testified that he had no concerns about the

6

relatives with whom his children had been placed. When asked about each child specifically, however, Father testified that his oldest, John, was living with Mother's brother, T.P., and he did not have any concerns about T.P. Father did, however, have concerns about Julie's placement with Mother's aunt, P.P., because he did not have a chance to talk to Julie very often. When asked about Jack, Father testified that he did not know where his children were and that no one told him anything about their placement. Father testified that when he asked about the children, however, he was told that Jack and Jeremy were living with G.C.

Father testified that he provided his children with financial support through his mother while he was incarcerated, including food and clothing. He also testified that his mother brought the children to see him several times, the children have written him letters, and that he spoke to John and Jesse on the phone two weeks before. He admitted, however, that he had not seen Julie since 2015 and he had not seen Jack and Jeremy since they were removed from his mother's care in 2016. Father testified that he tried to contact Julie, Jack, and Jeremy, but he had difficulty reaching their caregivers. He also testified that he sent the Department letters to distribute to Julie, Jack, and Jeremy one or two weeks before trial. According to Father, no one from the Department had come to visit him while he was in prison, and the only correspondence he received from the Department were hearing notices.

7

He later clarified that he had received a packet from the Department, but it did not include any information on services he might complete during his incarceration.

Father testified that when he was not incarcerated, he and the children lived with his mother and that he worked for his cousin's food truck and landscaping business. He also took the children to their doctor's appointments, and generally made sure that they were fed, clothed, and properly cared for. Father, who believed he would be eligible for parole in 2019, testified that he would be able to provide the children with the same care once he was released. Father also testified that he was planning to go back to work for his cousin.

Father also testified that he left the children in his mother's care when he went to prison, but they were removed from her home by the Department after she tested positive for illegal drugs. He did not have any other family members with whom the children could live, and he wanted the children returned to his mother's care because he did not believe that her alleged drug use had harmed the children.

Father agreed that the children should remain in their placements until he was released from prison, but he did not want to have his parental rights terminated. Father testified that he was only twenty-one years old when he went to prison, and, although he had made poor decisions in the past, he was leaving his criminal behavior behind him and doing everything he could, "physically, mentally, emotionally" to succeed as a father. He also testified that he had taken classes while

in prison to accomplish this goal, including a Changes class, which involved lessons on life skills and parenting. He was also working towards obtaining his GED, was involved with the church, and he had an unpaid job in prison.

Natasha Roy, a Department supervisor, testified that the Department was requesting to be named as John's and Jesse's permanent managing conservators because T.P. and A.C. had a history with the Department and they were not eligible to adopt. She further testified that the Department would complete a home study on the couple and a kinship safety evaluation to determine whether it could consent to T.P. and A.C. being named as the children's managing conservators.

Roy testified that the Department was seeking the termination of Mother's and Father's parental rights to Julie, Jack, and Jeremy because the children needed permanency and their respective caregivers, P.P. and G.C., had expressed a desire to adopt the children. According to Roy, P.P. and G.C. "want[ed]to provide a forever home for these children, a permanent home, meaning that mom cannot come back and file a motion to gain custody of these children and put them back in the same predicament that they . . . have come from." P.P. and G.C. were not willing to be named as the children's conservators unless Mother's and Father's parental rights were terminated. Roy testified that Mother had voluntarily relinquished her parental rights to Julie, Jack, and Jeremy and that the Department's primary concern with respect to Father was "[h]is violent criminal history."

Roy testified that termination of Mother's and Father's parental rights was in Julie's, Jack's, and Jeremy's best interests and appointment of the Department as John's and Jesse's permanent managing conservators was in the children's best interests because neither parent was stable. Roy testified that Mother and Father have been moving from one relative's home to another since Julie was born and that Julie "needs stability." Roy echoed similar sentiments about Jack and Jeremy. According to Roy, Mother and Father have never been stable and Jack and Jeremy "need a permanent placement, a forever home where [they] can maintain safe, be safe and maintain a stable environment." Roy also testified that Julie's caregiver, G.C., had helped Mother with Julie's care, and she "had a special interest in" the little girl. G.C. had also reported to the Department that she had provided Mother with financial assistance, and that Mother "was never stable. . . ."

Roy testified that Julie has a learning disability, and Jack has a mood disorder and has exhibited aggressive behavior. According to Roy, P.P. works with Julie's school and "goes over and beyond" what is necessary and was "most definitely" able to attend to Julie's academic needs. Roy testified that Jack was not exhibiting behaviors in the home, but rather at school. As a result, he was enrolled in a special class at school. G.C. was working with the school to address Jack's needs and she was planning to put him back in therapy. G.C. also attended Jack's special education meetings and was working with the school to ensure that Jack was "on track and

10

learning," despite his behavioral issues. Roy said, accordingly, that G.C. had been attentive to and understood the child's needs and expressed the desire to adopt him.

In terms of the children's desires, Roy testified that she had met with the children and spoke to some of them about "their hopes and dreams for their lives." According to Roy, Jack and Jeremy never mentioned Father or asked about their paternal relatives and the only thing Julie said about her father was that his attorney told her that Father misses her and wants to see her.

Roy said that she knew that Jack cared about G.C. because he hugged G.C. during one of the visits, he "was very respectful," and "was like a totally different kid," when he was with G.C. Roy said G.C. did not use physical discipline with the child, but rather age-appropriate consequences, and was able to control Jack's behavior.

Roy said, too, that the children each had relationships with the caregivers with whom they were placed going back to before the Department became involved with the family. Each child was therefore going to be able to maintain relationships with their extended family members. The children also had relationships with one another, and the Department made efforts to ensure that sibling visits occurred. The Department had no information indicating that the relatives would not continue these visits. Roy did not expect that the visits would occur with the same regularity because the children were getting older and would likely be more involved in after-

school activities, but she believed they would continue to see one another. Roy explained that each of the children's caregivers were in contact with extended relatives and family, and all the caregivers had each other's contact information. P.P. told Roy that she wanted Julie to see her brothers.

During cross-examination, Roy testified that P.P. had stated on several occasions that she would not want to keep Julie unless the parents' rights were terminated and, at one point, P.P. tried to have the sibling visits stopped. Roy also admitted that the Department had difficulties with P.P. sometimes because she was being argumentative and "not listening," and that P.P. and her nephew, T.P., did not always get along. Nonetheless, Roy testified, the children had all been living in their current placements since January 2018 and were all well-taken care of by their respective caregivers. She also did not believe that the past issues between P.P. and T.P., or between the Department and P.P., meant that sibling visits would not continue in the future, nor did these issues cause Roy any concern for any of the children's care. Roy testified that P.P. now "understands the importance of sibling visits."

Roy testified that the Department sent Father letters regarding the case, and she communicated to him about the services he would need to perform. Roy said that she sent Father a letter as recently as February 2019, asking Father for the names

12

of his relatives that could care for the children and she provided him with a copy of his family service plan, but Father never responded.

Roy testified that Father had not been in contact with Julie, Jack, and Jeremy. According to Roy, Father was incarcerated when Jeremy was born and, to her knowledge, Father has never met the child. When asked how Father was supposed to contact his children while incarcerated, Roy testified that he could have sent letters to the Department and asked that they be forwarded to the children and that the Department would have mailed letters from the children to Father. The Department, however, never received any correspondence from Father.

Roy testified that, considering Father's history, including with the Department, there was no indication that Father would be able to meet the children's emotional needs.

Roy testified that the Department had asked Mother to participate in several services during the case, including submitting to a psychological evaluation, a psychiatric evaluation, a substance abuse assessment, and random drug testing, and to maintain stable housing and employment and attend court hearings and visits with the children. Mother visited with the children, off and on, until December 2018, and participated in a psychological evaluation. However, she failed to provide certificates of completion for any other service, failed to provide a lease to demonstrate stable housing, and failed to provide statements in order to show she

13

was employed. Mother also failed to demonstrate that she was able to provide a safe and stable environment for the children.

Julie's caregiver, P.P., testified that Julie had been in her care for over a year and that she had been a part of Julie's life, off and on, since the child was born. According to P.P., Julie had been to her home for family gatherings and weekend visits. When asked about Julie's behavior, P.P. said that "you can tell that she has been through a lot but she's a good girl. I mean, she's a sweet girl but she just [has], her emotions are up and down." P.P. has enrolled Julie in basketball, soccer, and takes her to church. P.P. testified that a child needs to be loved, protected and wanted and that Julie's behavior suggested that she felt unwanted. She said Julie shows aggression and anger, gets in fights, exhibits sexual behaviors, and has mood swings—all of which the child's therapist was working on with the child. P.P. said she took classes to learn how to care for Julie and her behaviors and would continue to work with Julie if she were allowed to adopt. P.P. understood that it might take some time for Julie's behaviors to subside, and also understood the child's family's medical and mental health history.

P.P. testified that she wanted to adopt Julie because she has the tools and resources, both financially and emotionally, to provide Julie with the stability that Julie needs in her life. When asked to describe what stability meant to her, P.P. said an environment in which one knows where home is, where one is going to come

14

back to, that the home is yours and will not be taken away. P.P. had lived in her home for almost sixteen years, had been employed at the same company for the last four years, and she had no plans to move. She also had family in the area, including children of her own and her mother.

With regard to Julie's father, P.P. said she would not allow Father to talk to Julie if he called. P.P. was not aware that Julie knew who her father was, and she did not believe it was important at that stage of her life for Julie to know him. According to P.P., Julie knew that Father was in prison but did not know him personally and never spoke about him.

When asked if she would be willing to be named Julie's managing conservator without termination of the parents' rights, P.P. testified that she loved Julie but would rather have the child removed from her home. She explained that "if they're going to make a decision for her that I feel is not in her best interest, I need her to go ahead and transition. She's been through a lot. So she need[s] to adjust to whatever environment they want her to adapt to. That's why I said that."

P.P. testified that allowing Mother to have possession and access to Julie would cause Julie to continue to experience her negative behaviors because Julie acts up after Mother does not show up for scheduled visits and Mother is not always available when Julie wants to speak to her over the phone. P.P. said that she believed

that Julie's negative behaviors would continue if she continued to have sporadic contact with Mother.

P.P. also acknowledged that she asked the court to suspend visitation between Julie and her brothers and said she did not see value in those visits at that time. P.P. explained that Julie was working on addressing her behaviors, and that often visits with her siblings interrupted the progress that she had been making in therapy. P.P. believed, therefore, that Julie needed time to adjust to her environment and to meet with the therapist. With more therapy and time, P.P. believed that all the children "would be more healthy and they [would be able to] deal with their circumstances and situations." She said that once the children "balance out, then we can come together and make sure the kids can see one another. We are family." She testified that she hosts Easter, Thanksgiving, and Christmas at her home, and that the whole family is invited. She wanted Julie to have contact with her siblings and testified that if Julie's therapist recommended that Julie visit with her siblings, she would follow that recommendation.

She acknowledged that she had some conflict with her nephew, T.P., in the past but explained that they were family and T.P., like the rest of the family, was welcome in her home. She and T.P. had a disagreement during the suit but they have since "made amends" and she has invited T.P. and Julie's siblings to come to Julie's basketball games and church events.

G.C. is a close family friend/fictive kin who has been taking care of Jack and Jeremy for approximately over a year and wants to adopt them. According to G.C., the boys get along well with the other children in the home. G.C. also testified that she knew T.P. and P.P., she had their contact information, and she had no concerns about Jack and Jeremy visiting with their other siblings.

G.C. explained that she wanted to adopt Jack and Jeremy and provide them with a "stable environment and stop having, going from place to place living." She also testified that Mother and Father did not send anything for the children and that the only support she received for the children was from the Department. She further testified that although the boys knew about Father, they never asked to see him.

G.C. testified that Jack had exhibited some behavioral issues at school, but not at home, and that she was working with the school to meet Jack's academic needs. She was also planning to get him into therapy. Like P.P., G.C. testified that she was not willing to care for the boys if Mother's and Father's parental rights to Jack and Jeremy were not terminated, and she was not able to adopt them. G.C. testified that she would love to continue to care for the boys, but she "couldn't do it because that [would] put the kids through a lot more problems."

At the conclusion of trial, the trial court took the matter under advisement.

On May 29, 2019, the trial court signed a Decree for Termination and Decree in Suit Affecting the Parent-Child Relationship in which it named the Department

as the children's sole managing conservator. The decree terminated Mother's parental rights to Julie, Jack, and Jeremy pursuant to Texas Family Code section 161.001(b)(1)(K) and section 161.001(b)(2) and terminated Father's parental rights to Julie, Jack, and Jeremy pursuant to Texas Family Code section 161.001(b)(1)(D) and (E), and section 161.001(b)(2). *See* TEX. FAM. CODE §§ 161.001(b)(1) (D), (E), (K) & 161.001(b)(2). The decree also ordered that John and Jesse would remain in T.P.'s care and granted Mother restricted possession of and access to John and Jesse.

### Mother's Appeal

In two issues, Mother argues that the trial court erred by: (1) failing to appoint her as John's and Jesse's possessory conservator and (2) admitting the affidavit of voluntary relinquishment of parental rights that she executed with respect to Julie, Jack, and Jeremy because the affidavit had not been authenticated.

### A.    Conservatorship

Mother argues that the trial court erred by failing to appoint her as John's and Jesse's possessory conservator. Specifically, Mother argues that the trial court was required to appoint her as their possessory conservator because the MSA awarded her the right to visit John and Jesse and the trial court did not make any findings to rebut the presumption that she should be appointed as the children's possessory conservator under Family Code § 153.191.

### 1. Standard of Review and Applicable Law

Conservatorship determinations made after a bench trial are "subject to review only for abuse of discretion, and may be reversed only if the decision is arbitrary and unreasonable." *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). To determine whether a trial court abused its discretion, the appellate court must decide whether the court acted without reference to any guiding rules or principles, that is, whether its decision was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *In re J.J.G.*, 540 S.W.3d at 55. "An abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence," nor does an abuse of discretion occur so long as there is "some evidence of substantive and probative character to support the trial court's decision." *In re J.J.G.*, 540 S.W.3d at 55 (quoting *In re M.M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.)).

Legal and factual sufficiency of the evidence are not independent grounds of error, but relevant factors in determining whether the trial court abused its discretion. *Patterson v. Brist*, 236 S.W.3d 238, 245 (Tex. App.—Houston [1st Dist.] 2006, pet. dism'd). In determining whether the trial court abused its discretion, the appellate court applies a two-pronged test: "(1) whether the trial court had sufficient information on which to exercise its discretion and (2) whether the trial court erred

in its application of discretion." *Patterson*, 236 S.W.3d at 245 (quoting *Long v. Long*, 144 S.W.3d 64, 67–68 (Tex. App.—El Paso 2004, no pet.)). That is, the reviewing court determines, first, whether the evidence was legally and factually sufficient for the trial court to support a decision on conservatorship and, second, whether the decision made was reasonable. *See Patterson*, 236 S.W.3d at 245 (citing *Long*, 144 S.W.3d at 68).

In conducting a legal sufficiency, or "no evidence," review, we consider the evidence in the light most favorable to the trial court's judgment, disregarding all evidence and inferences to the contrary unless reasonable jurors could not do so. *City of Keller v. Wilson*, 168 S.W.3d 802, 810–11 (Tex. 2005); *see also Patterson*, 236 S.W.3d at 245. We do not disregard contrary evidence if (a) there is no favorable evidence, (b) contrary evidence renders supporting evidence incompetent, or (c) contrary evidence conclusively establishes the opposite. *City of Keller*, 168 S.W.3d at 810–11. Anything more than a scintilla of probative evidence is legally sufficient to support the trial court's finding. *See Patterson*, 236 S.W.3d at 245; *Long*, 144 S.W.3d at 66.

In determining whether the evidence was factually sufficient to support the trial court's judgment, we consider all the evidence and set aside the findings only if we find that they are so contrary to the overwhelming weight of the evidence as to

20

be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Patterson*, 236 S.W.3d at 245.

As relevant here, Family Code section 153.0071(e) states that a party is entitled to judgment on an MSA that meets the statutory formalities "notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law." *See* TEX. FAM. CODE § 153.0071(e); *In re Lee*, 411 S.W.3d 445, 453 (Tex. 2013). Under this section, a court must enforce such an agreement barring one narrow statutory exception. TEX. FAM. CODE § 153.0071; *see In re Lee*, 411 S.W.3d at 453.[3] Family Code section 153.191, which addresses the appointment of a parent as a possessory conservator, states:

> The court shall appoint as a possessory conservator a parent who is not appointed as a sole or joint managing conservator unless it finds that the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child.

TEX. FAM. CODE § 153.191.

### 2. Analysis

The record reflects that Mother and the Department entered into a properly executed mediated settlement in which they agreed that the Department would be

---

[3] Specifically, a court may only decline to enter judgment on a MSA when: (1) a party to the agreement was a victim of family violence, (2) that violence impaired the party's ability to make decisions, and (3) the agreement is not in the child's best interest. TEX. FAM. CODE § 153.0071(e-1); *see In re Lee*, 411 S.W.3d 445, 453 (Tex. 2013). Mother does not dispute that the exception is inapplicable in this case.

named as John's and Jesse's managing conservator, John and Jesse would be placed with their maternal uncle, T.P., and that Mother would have supervised visitation with John and Jesse at mutually agreeable times and places or, barring agreement, every other Saturday from two in the afternoon until six o'clock.

It is undisputed that the MSA complies with Family Code section 153.0071(d)[4] and that the parties are entitled to judgment in the form of a decree based on the MSA.[5] *See* TEX. FAM. CODE § 153.0071(d); *In re Lee*, 411 S.W.3d at 458–59. Although Mother and the Department agreed that the Department would be named as the boys' managing conservator, they did not include any language in the agreement indicating that Mother would be appointed as their possessory conservator. Therefore, the plain language of the MSA reflects that the parties did not intend for Mother to be named as the boys' possessory conservator. Furthermore, if the parties had intended for Mother to be named the boys' possessory conservator, they could just as easily have done so in the agreement.

Thus, the record reflects that the trial court had sufficient information on which to exercise its discretion with respect to conservatorship, namely, the MSA, and based on the plain language of the agreement, we cannot say that the trial court

---

[4] Mother does not address the application of section 153.0071 in her brief.

[5] Mother does not dispute that the only exception that would allow the trial court to refuse to enforce the MSA does not apply in this case. *See* TEX. FAM. CODE § 153.0071(e-1).

abused its discretion by not naming Mother as John's and Jesse's possessory conservator.

To the extent that there is a conflict between sections 153.0071 (entry of judgment on MSA) and 153.191 (appointment of parent as possessory conservator), the applicable rules of construction require us to hold that section 153.0071 prevails. *See In re Lee*, 411 S.W.3d at 454. Section 153.0071(e) mandates entry of judgment on a MSA "notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law." *See id.* (quoting TEX. FAM. CODE § 153.0071(e)). "The use of the word 'notwithstanding' indicates that the Legislature intended section 153.0071 to be controlling." *Id.* Therefore, the trial court was required to enter judgment on the MSA, regardless of the requirements of section 153.191. We further note that Mother's reliance on *In re Walters* is misplaced. 39 S.W.3d 280 (Tex. App.—Texarkana 2001, no pet.). Unlike here, the trial court did not enter judgment on an MSA in *In re Walters*. Furthermore, in that case, the trial court appointed the mother as a possessory conservator but denied her all access to the child. Here, the exact opposite is true—the court awarded Mother visitation in accordance with the MSA but declined to name her as the boys' possessory conservator.

We overrule Mother's first issue.

## B.     Affidavit of Voluntary Relinquishment

In her second issue, Mother argues that the trial court erred by admitting the affidavit of voluntary relinquishment of parental rights that she executed with respect to Julie, Jack, and Jeremy because the affidavit had not been authenticated. When the Department offered the affidavit of voluntary relinquishment into evidence at trial, Mother's counsel stated, "No objection." Father's counsel, however, objected on the ground that "[t]he mother is not here to prove up her Relinquishment. We have questions of whether she was coerced or whether she was under some emotional distress or under some influence of any drugs before she signed this Relinquishment." The Department responded that Father could not raise this objection on behalf of Mother. The trial court agreed, overruled the objection.

To preserve error in a trial court's ruling to admit evidence, the complaining party must normally make a timely and specific objection and obtain a ruling from the trial court. TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103(a)(1). A party, however, may rely on another party's objection to preserve error, but only if the record "reflect[s] a timely expression of an intent to adopt the objection." *Daniels v. Yancey*, 175 S.W.3d 889, 892 (Tex. App.—Texarkana 2005, no pet.). Here, Mother's counsel affirmatively stated that she did object to the affidavit's admission and she did not indicate any intention to adopt Father's objection. Because Mother neither made a

24

timely objection at trial, nor adopted Father's objection, she has not preserved this issue for appellate review. *See* TEX. R. APP. P. 33.1(a); *Daniels*, 175 S.W.3d at 892.

We overrule Mother's second issue.

## Father's Appeal

In three issues, Father argues that there is legally and factually insufficient evidence supporting the trial court's findings that he committed the predicate acts under subsection 161.001(b)(1)(D) and (E) and that termination of his parental rights is in Julie's, Jack's, and Jeremy's best interests. *See* TEX. FAM. CODE §§ 161.001(b)(1)(D), (E), 161.001(b)(2).

### A.    Standard of Review

Protection of the best interest of the child is the primary focus of the termination proceeding in the trial court and our appellate review. *See In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Accordingly, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

In a case to terminate parental rights under Texas Family Code section 161.001, the Department must establish, by clear and convincing evidence, that (1)

the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d at 362.

When reviewing the legal sufficiency of the evidence in a case involving termination of parental rights, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that there existed grounds for termination under section 161.001(b)(1) and that termination was in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b)(1), (2); *In re J.F.C.*, 96 S.W.3d at 266. In doing so, we examine all evidence in the light most favorable to the finding, assuming that the "factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* We must also disregard all evidence that the factfinder could have reasonably disbelieved or found to be incredible. *Id.*

When conducting a factual sufficiency review, we consider and weigh all the evidence including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d 336,

26

345 (Tex. 2009). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## B. Section 161.001(b)(1)(E)

In his second issue, Father argues that there is legally and factually insufficient evidence that he committed a predicate act under section 161.001(b)(1)(E).

### 1. Applicable Law

Section 161.001(1)(b)(E) requires the trial court to find by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" TEX. FAM. CODE § 161.001(b)(1)(E). As used in section 161.001, "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). In this context, endanger means to expose a child to loss or injury or to jeopardize a child's emotional or physical well-being. *Id.*; *see In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996).

27

Endangerment under subsection (E) arises when a parent's course of conduct jeopardizes the child's emotional or physical health. *See Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). This course of conduct includes acts, omissions, and failures to act, but it must be based on more than a single act or omission—the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent. *See id.*

The Department does not need to establish that a parent intended to endanger a child to support termination under Subsection (E). *See In re M.C.*, 917 S.W.2d at 270. Nor is it necessary to establish that the parent's conduct was directed at the child or caused actual harm; rather, it is sufficient if the parent's conduct endangers the child's well-being. *See Boyd*, 727 S.W.2d at 533; *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Danger to a child's well-being may be inferred from parental misconduct. *Boyd*, 727 S.W.2d at 533. "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). A parent's past endangering conduct may support an inference that past conduct may recur and further jeopardize the child's present or future physical or emotional well-being. *See id.*

The court's endangerment analysis also includes consideration of a parent's criminal record and how repeated criminal activity adds instability to the child's life with repeated parental incarceration and separation. *See Boyd*, 727 S.W.2d at 533–34 (stating that "imprisonment is certainly a factor to be considered by the trial court on the issue of endangerment"). While "mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child," "if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding [under Subsection] (E) is supportable." *Id.*; *see In re V.V.*, 349 S.W.3d 548, 554–55 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en banc) (affirming termination of father's parental rights under Subsection (E) for endangering conduct, noting his "extensive criminal history," repeated "criminal conduct leading to incarceration before and after the child's birth," "life of crime" that included four felonies as well as "assault and other crimes against the person," "no effort to care for his daughter when not incarcerated," and "irresponsible choices that deprived this child of a parent").

## 2. Analysis

Father argues that a single incarceration for a prolonged period does not show a continuing course of conduct sufficient to establish clear and convincing evidence. He further contends that he had been in contact with his children while he was

incarcerated to the extent that he could do so and that that there is no evidence that he had been unable to provide for or support his children financially or emotionally when he served his prior jail sentences.

The record reflects that Father repeatedly committed criminal offenses, including those involving violence and illegal drugs, throughout the course of his young children's lives, and not only one period of incarceration. Specifically, in October 2010, Father pleading guilty to committing the offense of possession of a controlled substance when Mother was pregnant with their first child, John, and Father was sentenced to six months in jail. In March 2013, Father pleaded guilty to committing the state jail felony offense of possession of cocaine and was sentenced to seven months in jail. In July 2015, Father pleaded guilty to committing aggravated robbery with a deadly weapon in October 2014, and aggravated assault with a deadly weapon in December 2014. He was sentenced to ten years' incarceration for each offense, with the sentences to run concurrently. According to the complaint for the aggravated assault charge, Father followed the complainant in a car, cornered him, and shot "multiple bullets at him" from "assault style firearms." Father continued shooting as the complainant drove away. At the time Father committed this offense, John was four years old, Julie was three years old, Jack was two years old, Jesse was one year old, and Mother was pregnant with Jeremy. Unless he is paroled, Father's projected release date is February 2025. Taken as a whole, this evidence

demonstrates that Father engaged in an escalating pattern of dangerous criminal activity during much of his children's lives that resulted in his absence for increasingly extended periods of time. *See Boyd*, 727 S.W.2d at 533–34.

Although Father testified that he provided his children with financial support through his mother while he was incarcerated, Jack's and Jeremy's caregiver, G.C., testified that she never received financial support from anyone other than the Department. Roy, the Department supervisor, also testified that she had "never heard that [the paternal grandmother] provided any financial[,] clothing or anything to the caregivers." *See In re H.R.M.*, 209 S.W.3d at 108; *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (stating fact finder is "free to make its own credibility assessments, resolve conflicts in the testimony, and decide what weight to give the witnesses' testimony").

Similarly, although Father testified that he had been in contact with the two children to whom his rights had not been terminated, John and Jesse, Father has not had any contact with Julie since 2015 and Jack and Jeremy since they were removed from A.W.'s care in 2016. Father testified that he tried to contact Julie, Jack, and Jeremy, but he had difficulty reaching their caregivers based on the information available to him. He also claimed that he sent the Department letters to distribute to the children one or two weeks before trial. Roy, however, testified that Father had not had any contact with Julie, Jack, or Jeremy and that the Department never

received letters for the children from Father. As the trier of fact, the trial court was not required to accept Father's testimony that he had supported his children financially and emotionally while he was incarcerated and could have resolved any disputed evidence against him. As the trier of fact, the trial court was entitled to discredit Father's testimony and resolve any conflicts in the evidence against him. *See In re H.R.M.*, 209 S.W.3d at 108; *In re G.M.G.*, 444 S.W.3d at 60.

Father argues that there is no evidence that he had been unable to provide for or support his children financially or emotionally when he served his prior jail sentences. Direct evidence, however, is not required. *See Boyd*, 727 S.W.2d at 533 (holding that conclusion that parent's criminal conduct endangers child's well-being "can be inferred from parental misconduct" itself). Even if Father was able to provide some support for his children while he was in jail, this does not mean that his conduct did not endanger his children's physical and emotional welfare because he was still absent from their lives for extended periods of time, subjecting them to a life of uncertainty and instability.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that Father had engaged in conduct which endangered Julie's, Jack's and Jeremy's physical or emotional well-being in violation of section 161.001(b)(1)(E). *See In re J.O.A.*, 283 S.W.3d at 344 (citing *In re J.F.C.*, 96 S.W.3d at 266). Further, in view

32

of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that Father had engaged in conduct which endangered Julie's, Jack's and Jeremy's physical or emotional well-being in violation of section 161.001(b)(1)(E). *See In re J.O.A.*, 283 S.W.3d at 345 (citing *In re J.F.C.*, 96 S.W.3d at 266).

Because we conclude the evidence is legally and factually sufficient to support the trial court's finding under section 161.001(b)(1)(E), we do not address Father's arguments that the evidence is legally and factually insufficient to support the trial court's finding under subsection (D). *See In re P.W.*, 579 S.W.3d 713, 728 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

## C.     Best Interest

In his third issue, Father argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in Julie's, Jack's and Jeremy's best interests.

### 1.     Applicable Law

There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best interest finding: the desires of the child; the present and future physical and emotional needs of the child; the present and future emotional and physical danger to the child; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, however, and evidence is not required on all the factors to support a finding that terminating a parent's rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533.

In addition, the Texas Family Code sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability

of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

Courts may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence when conducting the best interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Evidence supporting termination under one of the predicate grounds listed in section 161.001(b)(1) can also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of both section 161.001(b)(1) grounds and best interest). A parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d at 684; *see also Jordan*, 325 S.W.3d at 724. A factfinder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *In re D.M.*, 452 S.W.3d

462, 471 (Tex. App.—San Antonio 2014, no pet.) (citing *In re B.K.D.*, 131 S.W.3d 10, 17 (Tex. App.—Fort Worth 2004, pet. denied)).

### 2. Analysis

Julie, Jack, and Jeremy had been living with their current caregivers for over a year by the time of trial. Julie's caregiver, P.P., and Jack's and Jeremy's caregiver, G.C., are part of the children's extended family and they knew the children before the termination proceeding began. Specifically, P.P., Mother's aunt, had known Julie for most of the child's life and Julie had been to P.P.'s house for family gatherings and weekend visits. The record reflects that Julie is happy in P.P.'s home, and unlike in her previous placements, Julie is playing basketball and soccer and participating in church activities "where she's getting spiritual care and love." The record also reflects that Julie has special needs and P.P. has also provided Julie with a therapist, taken classes to learn how to care for Julie, and she works with Julie's school to make sure that all her academic needs are being met. P.P., who has steady employment and has lived in her house for over sixteen years, plans to adopt Julie if Mother's and Father's parental rights are terminated.

Jack and Jeremy had been living in G.C.'s home for over a year with G.C.'s other three children and G.C. plans to adopt Jack and Jeremy if Mother's and Father's parental rights are terminated. According to G.C., all the children get along well and are "like brothers and sisters." G.C. acknowledged that Jack, who has a

mood disorder and behavioral issues, had been having problems at school and she is engaged in Jack's education, attends his special education meetings, and recently sought out a therapist for him. She also uses age-appropriate discipline and had demonstrated an ability to control Jack's behaviors. According to the Department, Jack respects G.C. and is bonded with her. Jeremy, the youngest child, attends daycare and is meeting all his milestones. He does not have any behavioral issues.

The evidence also indicates that P.P. and G.C. do not pose a present or future physical or emotional danger to the children. *See generally In re O.N.H.*, 401 S.W.3d at 684 (stating that past conduct is probative of future conduct when evaluating child's best interest). P.P. and G.C. have also taken advantage of the services available to them, i.e., parenting classes and therapy services for the children, and they are working with Julie's and Jack's schools to meet the children's special educational and behavioral needs. Although the children's caregivers have had disagreements in the past, they have one another's contact information, and have indicated that they want the children to continue to see their siblings.

By all accounts, P.P and G.C. are meeting all of Julie's, Jack's, and Jeremy's current emotional, financial, and physical needs, and the Department believes they will be able to do so in the future. *See generally id*. There is nothing in the record indicating otherwise. The trial court could also infer from this evidence that P.P. and G.C. are able to provide Julie, Jack, and Jeremy with a stable, safe, and permanent

home, which is a paramount consideration in a court's best-interest determination. *See* TEX. FAM. CODE § 263.307(a); *see also In re K.C.*, 219 S.W.3d at 931.

While Julie, Jack, and Jeremy have not seen Father for several years and rarely, if ever, ask about him, the evidence reflects that the children are bonded with their respective caregivers, P.P. and G.C., and being well cared for in their homes. The trial court could infer from this evidence that the children wanted to remain with P.P. and G.C. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent.").

The evidence also indicates that, unlike P.P. and G.C., Father poses a present or future physical or emotional danger to the children. *See generally In re O.N.H.*, 401 S.W.3d at 684 (stating that parent's past conduct is probative of his future conduct when evaluating child's best interest). The record reflects that Father was convicted of four crimes over the course of five years for offenses involving the possession of illegal drugs, aggravated robbery, and aggravated assault. His most recent convictions were for first and second-degree felonies, both of which involved the use of deadly weapons, and the second of which included his repeatedly shooting assault-style weapons at the complainant. As a result of Father's convictions, he has been physically absent for most of Julie's, Jack's and Jeremy's lives. Furthermore,

the violent nature of Father's most recent offense for aggravated assault also raises the possibility that children in his presence will be subjected to violence even if the violent acts are not directed specifically at them. *See Walker*, 312 S.W.3d at 619 (considering father's past violence in best-interest assessment and noting that evidence of endangering conduct under Subsection (E) is also probative of best-interest analysis) (citing *In re C.H.*, 89 S.W.3d at 28). Although Father testified that he had reformed, the trial court, as the sole fact finder, was entitled to discredit Father's testimony and resolve any conflicts in the evidence against him. *See In re H.R.M.*, 209 S.W.3d at 108; *In re G.M.G.*, 444 S.W.3d at 60.

Although Father testified that he and the children lived with his mother, A.W., when he was not incarcerated, Roy testified that Mother and Father had provided an unstable home for the children and had moved from one relative's home to the next since their first child was born. Furthermore, Father's only plan for the children was that they be placed with A.W., even though the children had been removed from her care after she tested positive for methamphetamine and amphetamine. Father's desire to have the children placed with someone the Department does not consider to be an appropriate placement due to illegal drug use indicates that he does not recognize the potential risk that living with A.W. poses to the children. Although he testified that he provided support for the children while he was incarcerated, there is conflicting evidence on this issue and, as previously discussed, the trial court was

entitled to resolve these conflicts in the evidence against Father. *See In re H.R.M.*, 209 S.W.3d at 108; *In re G.M.G.*, 444 S.W.3d at 60. This evidence, in combination with Father's failure to contact his young children for three to four years prior to trial, demonstrates that Father did not provide the children with a stable, permanent, and drug-free home in the past, and he may not be able to do so in the future. The Department believes that, given Father's history, there was no indication he would be able to meet the children's physical or emotional needs.

Father also argues that the trial court erred by terminating his rights because the court had a less severe alternative available to it, namely, appointing P.P. and G.C. as the children's conservators and maintaining his parental rights just as the court had done with John and Jesse and their caregiver, T.P. Father's argument is unavailing. Unlike T.P., P.P. and G.C. are not willing to care for the children if Mother's and Father's parental rights are not terminated. The only relative that Father has identified who would be able to care for the children until his release from prison is his mother, A.W., and, as previously discussed, the Department has already determined that placing the children with A.W. was "inappropriate and unsafe for all of the children" due to her illegal drug use.

While there is evidence that Father participated in classes and found employment while in prison, has plans for employment after his release, and has expressed a desire to support and provide for his children, these are only some of the

40

factors that courts consider when conducting a best-interest analysis. Considering the record as a whole, the trial could reasonably have concluded that these factors are not so significant as to overcome the other factors supporting the trial court's finding that termination of Father's parental rights is in Julie's, Jack's, and Jeremy's best interests, including Father's criminal history, his prolonged absences from Julie's, Jack's and Jeremy's lives, and his inability to maintain a stable and safe home for the children.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of Father's parental rights is in Julie's, Jack's, and Jeremy's best interests. *See In re J.O.A.*, 283 S.W.3d at 344 (citing *In re J.F.C.*, 96 S.W.3d at 266). Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Father's parental rights is in Julie's, Jack's, and Jeremy's best interests. *See In re J.O.A.*, 283 S.W.3d at 345 (citing *In re J.F.C.*, 96 S.W.3d at 266). Accordingly, we hold that legally and factually sufficient evidence supports the trial court's best interest finding.

We overrule Father's third issue.

## Conclusion

We affirm the trial court's decree.


                                        Russell Lloyd
                                        Justice


Panel consists of Justices Lloyd, Kelly, and Goodman.